```
1                    FEDERAL TRADE COMMISSION
                        I N D E X

2

3    WITNESS:                          EXAMINATION:

4    WILLIAM BALSAMO

5         BY MS. CLAYBAUGH                    3
          BY MR. BERNETT                     66

6

7

8
                          - - -
9         N O   E X H I B I T S   M A R K E D
                          - - -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                 IN THE UNITED STATES DISTRICT COURT

2                 FOR THE MIDDLE DISTRICT OF FLORIDA

3                       TAMPA DIVISION

4

5    FEDERAL TRADE COMMISSION,        )

6            Plaintiff,               )    Civil Action No.

7    vs.                              )    8:12-CV-586-T-35EAJ

8    PRO CREDIT GROUP, LLC, ET AL,    )

9            Defendants.              )

10                              Thursday, April 12, 2012

11

12                              Cove & Associates, P.A.

13                              225 S. 21st Avenue

14                              Hollywood, Florida 33020

15

16

17           The above-entitled matter came on for

18   investigational hearing, pursuant to notice, at 11:30

19   a.m.

20

21

22

23

24

25
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
              MELINDA CLAYBAUGH, Attorney
 3            Federal Trade Commission
              600 Pennsylvania Avenue, N.W., M-8102B
 4            Washington, D.C. 20580
              (PRESENT BY TELEPHONE)
 5
 6    ON BEHALF OF SANDERS LEGAL GROUP, P.A.;
       SANDERS LAW, P.A.:
 7            ROBERT D. ECKARD, Attorney
              Law Office of Robert Eckard & Associates, P.A.
 8            3110 Alternate 19 N.
              Palm Harbor, Florida 33643
 9            (PRESENT BY TELEPHONE)
10
      ON BEHALF OF FIRST FINANCIAL ASSET SERVICES, INC.;
11     WILLIAM BALSAMO:
              HECTOR E. LORA, Attorney
12            ANDREW N. COVE, Attorney
              Cove & Associates, P.A.
13            225 South 21st Avenue
              Hollywood, Florida 33020
14
15
16    Also present:
      MARK BERNETT, Receiver
17    (PRESENT BY TELEPHONE)
18
19
20
21
22
23
24
25
```

FTC 70
p. 3 of 77

```
1                    P r o c e e d i n g s

2           Deposition taken before Michele Anzivino, Court

3    Reporter and Notary Public in and for the State of

4    Florida at Large, in the above cause.

5                         - - -

6    Thereupon,

7                         WILLIAM BALSAMO,

8    having been duly sworn or affirmed, was examined and

9    testified as follows:

10               THE WITNESS:  I do.

11                    DIRECT EXAMINATION

12   BY MS. CLAYBAUGH:

13        Q.    Good morning, Mr. Balsamo.

14        A.    Good morning.

15        Q.    As you know, the FTC has filed a complaint

16   called FTC v. Pro Credit Group et al, correct?

17        A.    I do.

18        Q.    And as the court has issued a temporary

19   restraining order, that provides that the FTC may

20   conduct depositions of parties relating to the nature

21   and location of documents and assets of the defendants

22   named in the complaint.  Do you understand that?

23        A.    I do.

24        Q.    Okay.  And it's pursuant to that authority

25   today that I will be taking your deposition.  Have you
```

1     been deposed before?

2          A.     Not that I can recall.

3          Q.     Let me just go over a couple ground rules.

4     One is that I'm going to need a verbal answer from you

5     for every question, especially because I can't see you

6     today.  Do you understand that?

7          A.     Yes.

8          Q.     Okay.  And if you don't understand the

9     question or you can't hear what I'm saying, please

10    feel free to ask me to repeat it or to speak up, okay?

11         A.     Okay.

12         Q.     And finally, if you need a break at any

13    time, just ask for one and we'll be happy to give it

14    to you.

15         A.     Okay.

16         Q.     With that, can you please state your full

17    name for the record?

18         A.     William Balsamo.

19         Q.     How old are you?

20         A.     52 years old.

21         Q.     What is your current address?

22         A.     10376 Palmgren Lane, Spring Hill, Florida.

23         Q.     Are you currently employed?

24         A.     No, I'm not.

25         Q.     Were you employed up until March 20, 2012?

1          A.     No, I'm not.

2          Q.     When was the last time you were employed?

3          A.     When you say "employed," do you mean taking

4    a check?

5          Q.     Performing work or receiving money.

6          A.     Okay.  Receiving money, I believe March of

7    2011.

8          Q.     Okay.  So approximately March of 2011 was

9    the last time that you received money?

10         A.     I believe that's true.

11         Q.     And before March 2011, what was your

12   employment?

13         A.     I was with First Financial Asset Services.

14         Q.     And when did your employment with First

15   Financial begin?

16         A.     Well as you are aware, I'm president of the

17   company.  So the actual date that we started the

18   company I'm not a hundred percent sure of.

19         Q.     Okay.  Can you give me an approximate range?

20         A.     I would think the beginning of 2010.

21         Q.     And when the company began in 2010 you were

22   its president, correct?

23         A.     Yes.

24         Q.     And did you remain its president until March

25   of 2011?

1        A.     Well, the company is still active and I'm

2   still president.  I just thought that when you meant

3   am I, you know, getting a paycheck, when the paychecks

4   stopped.  I'm still president of First Financial Asset

5   Services.

6        Q.     Okay.  Thank you.

7               Now, between the beginning of 2010 and March

8   2011, what were your responsibilities at First

9   Financial?

10       A.     Can you clarify that, please?

11       Q.     What were your job responsibilities as

12  president?

13       A.     Payroll, overseeing the office.

14       Q.     Anything else?

15       A.     I'm not sure.  I mean, it's a difficult

16  question to answer.

17       Q.     And what kind of business was First

18  Financial engaged in?

19       A.     It was a customer service company.

20       Q.     Anything else?

21       A.     No.

22       Q.     And who did it provide customer service for?

23       A.     Customers.  I'm trying to -- I know that

24  soun -- I'm trying to understand the question,

25  Melinda.  If you could be a little more clear.

1      Q.     Okay.  Well, you mentioned that First

2    Financial provides customer service.

3      A.     Right.

4      Q.     And so I'm asking to what customers.

5      A.     Customers that we obtained.

6      Q.     Okay.  And how did you obtain those

7    customers?

8      A.     We obtained them through call centers.

9      Q.     Okay.  You say "we," you mean First

10   Financial?

11     A.     That's what I do mean, yes.

12     Q.     Okay.  Now how did you obtain these

13   customers through call centers?

14          MR. LORA:  Melinda, I think I'm going to

15      have to object that you're going beyond of scope

16      of this asset deposition.  I understand that you

17      need to ask some basic background questions to

18      confirm that this is the guy that you want to be

19      talking to here today but, you know, you're

20      getting into at this point how this -- his

21      particular corporate defendant operated, and I

22      just think that's outside the scope of this asset

23      deposition.  I just want to make that objection

24      for the record.

25          MS. CLAYBAUGH:  Okay.  I hear that.  But

1          this deposition is actually not limited to assets.

2          It's limited to the nature and location of assets

3          and documents of the defendant.  So it's on that

4          ground that I'm asking about the scope of his

5          business so I can ascertain who might have

6          documents related to First Financial's business.

7                    MR. LORA:  Understood.

8                    MS. CLAYBAUGH:  Okay.

9                    MR. LORA:  Answer the question as best you

10         can.

11                   THE WITNESS:  I need to hear the question

12         again.  I'm sorry.

13                   MS. CLAYBAUGH:  Okay.  Could the court

14         reporter read back my last question, please?

15                   (Thereupon, a portion of the record was read

16    by the reporter.)

17                   THE WITNESS:  We purchased the order or we

18         purchased -- yeah, we purchased the orders from

19         call centers that made the initial sale.

20    BY MS. CLAYBAUGH:

21         Q.   Okay.  So what do you mean -- what does it

22    mean to purchase an order?

23                   MR. LORA:  Same objection for the record.

24                   THE WITNESS:  What does it mean to purchase

25         the order?  Was that the question?

1           MR. LORA:  Yes.

2    BY MS. CLAYBAUGH:

3        Q.    Yes.

4        A.    I think it means exactly -- you know, I'm

5    trying to convey exactly what I stated there.  The

6    room initially sold an order.  If that order fit our,

7    you know, profile -- I don't even know the right term

8    now we use -- but you know, we would purchase the

9    order.

10        Q.    Okay.  So let me just give you a

11   hypothetical and you can tell me if I have this right.

12   A telemarketing room would contact customers by

13   calling them, correct?

14        A.    Yes.

15        Q.    They would attempt to sell a product.  If

16   the customer agreed to purchase that product, then you

17   would purchase that customer; is that right?

18           MR. LORA:  Before you answer, and

19        just -- let me see if I can make this a little

20        smoother.  I'm going to make a continuing

21        objection to this series of questions that to me

22        aren't reasonably calculated to lead to the

23        discovery of documents or assets.  I'm trying not

24        to muddy up the record, but I want to be clear

25        that unless you're asking about the location of

1          documents or assets, it's outside the scope of

2          this deposition, okay?  So go ahead and continue

3          and answer the question to the best of your

4          ability.  Read it back, please.

5              (Thereupon, a portion of the record was read

6      by the reporter.)

7              THE WITNESS:  Only if it met our guidelines.

8      BY MS. CLAYBAUGH:

9          Q.    And what were your guidelines?

10         A.    I don't recall right off the top of my head.

11         Q.    Were the telemarketing rooms selling

12     anything aside from credit card interest rate

13     reduction services?

14         A.    That I don't know.

15         Q.    And what are the names of the telemarketing

16     rooms that you worked with?

17         A.    I don't recall the names off the top of my

18     head either.

19         Q.    How many rooms were there?  If you could

20     just give me an estimate.

21         A.    I would say, just a guesstimate, six or

22     seven.

23         Q.    Okay.  And what was the product that they

24     were selling?

25         A.    I don't know all the products that they were

1    selling.

2         Q.    Well, you said if it fit your criteria that

3    you would purchase that order, correct?

4         A.    I would, yes, but you're asking me what

5    products they were selling.  And as I mentioned

6    before, I'm really not aware of all the products that

7    they were selling.

8         Q.    And the products that you purchased, were

9    they interest rate reduction products?  For instance,

10   the orders that you purchased, were they interest rate

11   reduction orders?

12        A.    They were.

13        Q.    Did you purchase any other orders?

14        A.    Well, they were interest rate reduction

15   orders plus other programs we had depending upon the

16   timeframe that you're asking about.

17        Q.    And what were the other programs that you

18   had?

19        A.    I'd have to look the whole thing up, but we

20   had interest rate redu -- I mean prepaid legal, we had

21   identity theft programs, we had magazine programs, we

22   had a few others.  But again, off the top of my head,

23   you know, that's what I can remember right now.

24        Q.    Were those programs that you mentioned, the

25   prepaid legal, the ID theft and the magazine programs,

1    were they offered in connection with the interest rate

2    reduction or offered separately?

3         A.    I believe they were -- well, they were a

4    part of a program -- the interest rate reduction was a

5    bonus to some of those programs.

6         Q.    Okay.  Now, you mentioned that you purchased

7    orders.  How much did you pay for these orders?

8         A.    That varied.

9         Q.    Could you give me a range?

10        A.    Between 55 and 60 percent -- or 52 and 60

11   percent.  Maybe in that range.  I'm not -- I -- I

12   can't say that firmly.  Might have been one -- you

13   know, some that were 61 or 62, or some that were 52,

14   but in that range.

15        Q.    Okay.  So let me make sure I have this

16   straight.  If a customer paid say $1,000 for an

17   interest rate reduction program and you purchased that

18   order, you would pay the telemarketing room that sold

19   that customer let's say between 500 -- between 55 and

20   60 percent of $1,000?

21        A.    That's correct.

22        Q.    Is that right?  Okay.  So I take it at some

23   point the order or the customer entered into your

24   company, became your company's customer; is that

25   right?

1     A.    Yes.

2     Q.    Okay.  And what services did you perform for

3  these customers?

4     A.    We were mostly customer service.  We handled

5  any calls, if they had questions, things like that.

6     Q.    Okay.  What kind of questions would they

7  call with?

8     A.    They might call on how to use a program or

9  questions about billing.

10     Q.    Speaking of billing, was it First Financial

11  that billed the customers?

12     A.    I believe in most cases -- you know, I don't

13  know.  We had a management company called Calif

14  Management.  I think that did a lot of the billing, as

15  well.

16     Q.    And Calif Management, who owns that company?

17     A.    I believe I owned it at one point, I believe

18  my wife owned it at one point.  I think right now I am

19  the owner, but I'm not 100 percent sure on that.

20     Q.    Did Calif Management engage in any other

21  business aside from billing First Financial customers?

22     A.    When I originally set that company up, it

23  was a management company for all business I had

24  including real estate and --

25     Q.    Okay.  And when did you set that company up?

1      A.    I don't remember.

2      Q.    Well, during the time period of First

3   Financial --

4      A.    Prior to.

5      Q.    -- through the beginning of 2010 and March

6   2011, did Calif Management engage in any other

7   business aside from billing First Financial customers?

8      A.    I think for that period of time that was all

9   it did.

10      Q.    Okay.  So is it fair to say that either

11   First Financial or Calif Management billed all of the

12   First Financial customers?

13      A.    Yes.

14      Q.    Okay.  So just trying to figure out kind of

15   logistically, if the telemarketing room sold a

16   customer did they take down the customer's billing

17   information?

18      A.    Yes, they did.

19      Q.    And they transmitted it to First Financial?

20      A.    Yes, they did.

21      Q.    For billing.  Okay.

22            Who hired the telemarketing room?

23      A.    I don't know what you mean by "hired."  None

24   of them actually worked for me.

25      Q.    Well, who did they work for?

1      A.    I think they worked for many fulfillment

2    companies.  It was just a -- people that we did

3    business with.  We -- you know, they also did business

4    with other companies other than mine, as well.

5      Q.    I understand that.  Was there a contract

6    governing the relationship between First Financial and

7    the telemarketing room selling the First Financial

8    products?

9      A.    You know, I'm not sure of that.  I had

10   counsel that handled things like that, and if there

11   are I don't have -- I don't have them right in front

12   of me.

13     Q.    Who would have those documents?

14     A.    I don't know.  I would imagine if there are

15   documents they would be at the office that you've been

16   in I think.  I mean, I don't know where else they

17   would be.

18     Q.    That's the Hudson Florida office?

19     A.    That's correct.

20     Q.    You mentioned that the terms of the payment

21   between First Financial and the telemarketing rooms

22   was approximately 55 to 60 percent per customer,

23   correct?

24     A.    Yes.

25     Q.    Okay.  Would the terms of that arrangement

1   be reflected in the documents you were just talking

2   about?

3       A.    I don't know.

4       Q.    Did you have verbal agreements with the

5   telemarketers?

6       A.    What do you mean by a verbal agreement?

7   Like a handshake?

8       Q.    Well, what I'm trying to get at is what

9   could I look at to find the terms of the -- of your

10  agreements with the telemarketers including the

11  payment terms?

12      A.    I don't know.  Deal sheets?  I don't know.

13  I don't know the answer to your question.  What else

14  you could look at?  I really don't know the answer to

15  that.

16      Q.    You mentioned deal sheets.  What are those?

17      A.    They're the sheets that -- you know, you've

18  been in my office and you've looked at all the sheets

19  of all the customers.

20      Q.    Is that something that was generated by the

21  telemarketers?

22      A.    Yes.

23      Q.    Okay.  And I take it that they were at some

24  point transmitted to First Financial?

25      A.    Yes, they were.

1        Q.     And at what point in a customer's

2   transaction would those sheets have been transmitted

3   to First Financial?

4        A.     After the -- after the sale.

5        Q.     Okay.  Were they transmitted on a daily

6   basis or a weekly basis?

7        A.     They were transmitted as soon as a sale was

8   made.

9        Q.     Okay.  And how were they transmitted?

10       A.     Usually via fax.

11       Q.     Okay.  And did First Financial keep copies

12   of all of the deal sheets?

13       A.     Yes, we did.

14       Q.     And would all those deal sheets be located

15   at the Hudson Florida office?

16       A.     Yes, they would.

17       Q.     Would they be located anywhere else?

18       A.     No, they would not.

19       Q.     At the time that First Financial began in

20   early 2010, where was First Financial located?

21       A.     We were located in New Port Richey in

22   Florida.

23       Q.     What was the address?

24       A.     I don't remember the address right off the

25   top of my head.

1     Q.     Okay.  And then did the office move at some

2     point?

3     A.     Yes.

4     Q.     Where did it move?

5     A.     It moved up the road to U.S. 19 in Port

6     Richey, Florida.

7     Q.     Okay.  Then did it move anywhere else?

8     A.     Not until we stopped taking orders and we

9     had no reason to have that big of a space, and then I

10    moved over to the office that we are in now.

11    Q.     In Hudson?

12    A.     That's correct.

13    Q.     Okay.  So let's just step back to the

14    transaction we were walking through.  It sounds like

15    after the telemarketer made a sale, First Financial

16    purchased the order and received the deal sheet.  Then

17    what did First Financial do on each deal?

18    A.     What do you mean?  I'm not getting the

19    question, Melinda.  Sorry.

20    Q.     Okay.

21    A.     So we filed it -- I mean, we filed them

22    away.  I'm not sure.  Do you want to know

23    where -- what we did with the form once we were done?

24    Q.     I want to know what steps you took to

25    provide customer service or to fulfill what they had

1    purchased.

2         A.    Well, to provide customer service we had a

3    whole staff of customer service reps on call from 9:00

4    in the morning until 8:00 at night.

5         Q.    And how many reps did you have?

6         A.    I would think 12 to 14.

7         Q.    And what was your customer service number?

8         A.    I don't remember.

9         Q.    Did the reps -- did First Financial mail

10   anything to consumers?

11        A.    No.

12        Q.    Okay.  Did anyone mail anything to First

13   Financial consumers on First Financial's behalf?

14        A.    Yes.

15        Q.    Okay.  What was mailed to consumers by whom?

16        A.    It was a package for them to fill out and

17   send back to us so that we can -- or so the

18   fulfillment company could do the work that they were

19   supposed to do.

20        Q.    Okay.  So the package, what did this package

21   include?

22        A.    You know what, Melinda?  This is a long,

23   long time ago and I don't remember all the details of

24   the package.

25        Q.    Okay.  Just describe it as best you can.

 1        A.     There's really -- I can't describe it at

 2    all.  It's been -- I haven't seen one of these

 3    packages in probably 14 months now.  I don't remember

 4    what the package -- I can't honestly answer that.

 5        Q.     Well, you mentioned there was a package to

 6    fill out.  What would the consumer have to fill out?

 7    What kind of information was the consumer meant to

 8    provide?

 9        A.     The information so that the fulfillment can

10    do their interest rate reductions.

11        Q.     Okay.  So who would direct the package to be

12    sent out, was it First Financial?

13        A.     No.

14        Q.     Who did that?

15        A.     I don't remember the name of the company.

16        Q.     So it was a company that was mailing out the

17    packages for customers to fill out, correct?

18        A.     Correct.

19        Q.     Separate company?

20        A.     Uh-hum.

21        Q.     And who paid that company?

22        A.     First Financial.

23        Q.     Okay.  And on what basis did First Financial

24    pay that company?

25        A.     We paid them on every customer we obtained.

 1          Q.     Okay.  Do you remember what you paid them?

 2          A.     I believe it was between $105 and $110 per

 3    order.

 4          Q.     Okay.  Now just walking through the process,

 5    so the package goes to the customer, they fill it out.

 6    Who do they mail it back to?

 7          A.     The fulfillment company.

 8          Q.     And which fulfillment company is that?

 9          A.     Again, I can't remember the name right off

10    the top of my head.

11          Q.     Was it Consumer Budget Services?

12          A.     I don't know.

13          Q.     Was it ExecuServices?

14          A.     I don't think so.  But then again, I'm not a

15    hundred percent sure.  Like I said, this is a long,

16    long time ago since I've done this.

17          Q.     Did First Financial receive packages back in

18    the mail from consumers?

19          A.     No.

20          Q.     So let's say the packages are received by

21    the fulfillment company.  And then what happens?

22          A.     The fulfillment company would negotiate on

23    behalf of the customers.

24          Q.     Negotiate what?

25          A.     Credit cards.  Credit card rates.

1      Q.     Did they do anything else?

2      A.     Not that I'm aware of.

3      Q.     Okay.  And then let's say a customer had a

4    question about that process or a customer wanted a

5    refund.  Who would they call?

6      A.     They often called us.

7      Q.     Okay.  How did they receive your phone

8    number?

9      A.     Well, the phone number was given to them at

10   the time of the sale.  I believe, and I'm not a

11   hundred percent sure of this, but I'm pretty confident

12   that the phone number was in the package they received

13   and it was also on their credit card statement.

14     Q.     And the package they received, I know you

15   said you don't remember what was in it, but did it

16   come under the cover of First Financial?

17     A.     Melinda, I really can't answer these

18   questions.  I really don't remember what the package

19   even looks like.

20     Q.     Well, is it possible that it came under the

21   name of another company?

22     A.     Like I said, I really don't remember.  I

23   mean, I don't know if it was a blank or if it was an

24   initialed or if it was -- I don't know if it was

25   general.  I really don't remember what the package

1     actually looks like.  I can't visualize it right now.

2          Q.    So let's say First Financial received a call

3     from a customer complaining about -- a customer who

4     wanted to know what the status of her interest rate

5     negotiations were.

6          A.    Okay.

7          Q.    Would First Financial handle that call or

8     transfer it to someone else?

9          A.    Did you get my answer?

10         Q.    No.

11              MR. BERNETT:  Sorry to interrupt.  This is

12         Mark Burnett.  I'm just appearing now.

13              THE WITNESS:  Can we repeat the last

14         question?

15              MS. CLAYBAUGH:  Can the court reporter read

16         it back, please?

17              (Thereupon, a portion of the record was read

18    by the reporter.)

19              THE WITNESS:  Yeah, we would handle the

20         call.

21    BY MS. CLAYBAUGH:

22         Q.    And so how would you respond to a customer

23    who was seeking to know the status of their interest

24    rate negotiations?

25         A.    I believe we had access to the customer's

1    negotiations or the negotiation process.  However,

2    that's an I think.  I'm not a hundred percent sure

3    anymore.  Again, I'm going to say this was a long time

4    ago.

5        Q.    And by access to that, is that the Qualcomm

6    database you are talking about?

7        A.    I'd like to say yes, but I'm really not a

8    hundred percent sure.  Like I said again, you know, a

9    long time ago.

10       Q.    Did you personally have access to that

11   database?

12       A.    What database?

13       Q.    Well, you said that to check on the status

14   of a customer's interest rate negotiations you

15   mentioned that you would look up the customer's

16   information.

17       A.    Uh-hum.

18       Q.    So where would you look that up?

19       A.    Through our computers I believe we had

20   access.  But like I'm saying, again, you know, these

21   are all beliefs or I thinks because again, this is a

22   long time ago.  So you're asking me very specific

23   questions, but I can't be that specific on the answers

24   because, you know, a long time ago.

25       Q.    The bottom line question is did you or any

1    of your employees -- well, let me start with your

2    employees.

3              Did your employees have access to a computer

4    program with information about First Financial

5    customers?

6        A.    I think so.

7        Q.    Did you have access to that information?

8        A.    If I did, it was something I really wouldn't

9    have used.  I had people to do that.

10       Q.    If a customer called First Financial asking

11   for a refund, what was the process for handling that?

12       A.    I think each scenario was unique.

13       Q.    Well, you were the president of First

14   Financial, right?

15       A.    Right.

16       Q.    As president, did you give any direction to

17   your employees about how to handle requests for

18   refunds?

19       A.    My employees were always given the right to

20   refund any customer that they felt they needed to.

21       Q.    And would they have to seek authorization

22   from you to issue a refund?

23       A.    No, they would not.

24       Q.    Would they have to seek authorization from

25   anyone to issue a refund?

1      A.     No, they would not.

2      Q.     Would they notify you of refunds they had

3  granted?

4      A.     No, they would not.

5      Q.     Were refunds -- was the policy --

6      A.     Let me take that back.  Hold on a minute.  I

7  may have received reports every now and then because I

8  would get, you know, reports so that we could track

9  merchant accounts and billing and payouts.  So I may

10  have gotten refund reports, but I didn't have to

11  be -- they never had to ask me if they needed to do a

12  refund.

13      Q.     For the refunds that were granted, how were

14  the consumers paid?

15      A.     I think many were credit card refunds

16  through their credit card.  I also believe that we

17  wrote checks to some.  Maybe they didn't have that

18  credit card anymore, we couldn't do a refund.  So it

19  varied.

20      Q.     So those were the two ways that consumers

21  would receive refunds?

22      A.     Two ways I can think of right now.

23      Q.     And when you wrote checks to consumers for

24  refunds, what account would those checks be written

25  off of?

1      A.    I'm not sure I remember.

2      Q.    Would they have been written off the Calif

3  Management account?

4      A.    It's possible.

5      Q.    Would they have been written off any other

6  account?

7      A.    It's possible.  It would either been a Calif

8  Management account or a First Financial account.

9      Q.    By the way, I forgot to ask earlier.  When

10  customers were billed by you, how did the -- what was

11  the billing description that appeared on their

12  statement?

13      A.    It was -- I believe it was First -- it was

14  F-i-r-s-t-f-i-n, and then our toll free customer

15  service number.

16      Q.    Was it ever any other descriptor?

17      A.    Not that I recall.

18            MR. COVE:  Melinda, I just want to pipe up

19      for a second.  I'm wandering in and out, and it's

20      crystal clear to me that some of these questions

21      are obviously substantive questions that have

22      nothing to do with locating assets or documents.

23      So with all due respect, I want you to note for

24      the record if you want a second depo we are going

25      to definitely object to it.  I'm not going to want

1           you to ask these questions a second time.  So it's

2           either now or later, but it's not going to be

3           both.

4                 MS. CLAYBAUGH:  Okay.  Well, we can take

5           that up later.  I'm confident that all of my

6           questions are intended to lead to people, entities

7           who might have documents of First Financial and

8           ascertaining what documents First Financial

9           maintains.

10                MR. COVE:  Okay.

11    BY MS. CLAYBAUGH:

12          Q.    Speaking again of the credit card

13    processing, you said that it was done either by Calif

14    Management or First Financial, correct?

15          A.    Yes.

16          Q.    And through what accounts did those entities

17    process, through what merchant accounts?

18          A.    I don't know what you mean.

19          Q.    Well, you had to apply for an account to

20    process a consumer's credit cards, correct?

21          A.    Yes.

22          Q.    And with whom did you apply?

23          A.    EPayData.

24          Q.    PayData?

25          A.    EPay.

```
 1        Q.    EPayData.  Okay.  Any others?

 2        A.    That I applied?  Not that I can recall.

 3        Q.    Okay.  Would anyone else have applied for

 4   accounts to process cards of First Financial

 5   customers?

 6        A.    I may have asked my wife to.

 7        Q.    That's Susan Balsamo?

 8        A.    Yep.

 9        Q.    Okay.  And to whom did she apply for such

10   accounts?

11        A.    EPayData.

12        Q.    Okay.  Any others?

13        A.    Not that I recall.  I believe the only

14   company we dealt with was ePayData.

15        Q.    Okay.  So the only -- to the best of your

16   recollection, ePayData was the only company through

17   which cards were processed for First Financial

18   customers?

19        A.    Yes.

20        Q.    Now you've mentioned that you had 12 to 14 I

21   believe employees at First Financial; is that right?

22        A.    Yes.

23        Q.    And is it fair to say based on what you said

24   that their primary duties were responding to

25   complaints and questions of First Financial customers?
```

1    A.    Data and -- I mean, that wasn't their only

2    tasks.

3    Q.    Okay.  What were their other tasks?

4    A.    They did data entry and they -- you know,

5    just typical day-to-day operation kind of stuff.  You

6    know.

7    Q.    So data entry, what kind of data was

8    entered?

9    A.    Customer information.

10   Q.    Okay.  And what kind of information would

11   have been entered?

12   A.    Just their, you know, pertinent information.

13   Q.    Well, I guess -- here's what I'm wondering

14   about.  You said that the fulfillment center is the

15   one that does the actual credit card negotiating,

16   correct?

17   A.    That's correct.

18   Q.    So is it the fulfillment center that would

19   maintain the information about those negotiations?

20   A.    On the negotiation side, yes.

21   Q.    Okay.  Did First Financial maintain any

22   information about the negotiations?

23   A.    No, not that I recall.

24   Q.    Okay.  So when you say on the negotiation

25   side, was there another side that you are talking

1    about?

2        A.    I'm not -- I'm not sure what you're trying

3    to ask me there.

4        Q.    Well, you said the fulfillment center would

5    maintain information on the negotiation side.

6        A.    Isn't that what you asked me?

7        Q.    I asked you if did maintain information.

8    You said yes, on the negotiation side.

9        A.    Okay.

10       Q.    I'm asking you, is there another side that

11   you had in mind when you said that?

12       A.    No.  Just, you know -- I mean, pertinent

13   information.  Data entry of customer information.  You

14   know, we --

15       Q.    So would you report for instance the -- like

16   if a customer called in to complain, would you record

17   that information or would your employees?

18       A.    What do you mean by record?

19       Q.    Well, the data entry that you keep referring

20   to, I'm trying to figure out what it is.

21       A.    There may have been notes.

22       Q.    Okay.  Did you enter in information about

23   the customer's credit cards and debt?

24       A.    You know what?  I'm really not sure.  That

25   wasn't a day-to-day task of mine.

1        Q.    Well, did you direct anyone to do that?

2        A.    You know what, Melinda?  Again, this is so

3   long ago I just really don't remember this -- as

4   specifically as you'd like me to on some of these

5   questions.  But, you know, you have to have a little

6   understanding that this was a long time ago.

7        Q.    Did you pay your 12 to 14 employees?

8        A.    Yes.

9        Q.    You personally paid them?

10       A.    The company paid them.

11       Q.    From what account?

12       A.    I believe we had a payroll account.

13       Q.    In the name of what company?

14       A.    First Financial Asset Services.

15       Q.    Okay.  And how were those employees paid?

16       A.    Excuse me?

17       Q.    How were the employees paid, were they paid

18   by check?

19       A.    By check.

20       Q.    Okay.  On a weekly basis?

21       A.    Yes.

22       Q.    Did they receive a salary?

23       A.    On an hourly basis, yes.

24       Q.    An hourly salary.  Did that salary fluctuate

25   based on any factors?  In other words, were they paid

1     more or less based on anything they did in their job?

2         A.    Only on hours worked.

3         Q.    Okay.  Now, I'm just trying to figure out in

4     terms of the money.  You said that First Financial

5     would pay the room 55 to 60 percent.  Is that after

6     refunds and chargebacks or is that before refunds and

7     chargebacks?

8         A.    If we refunded a chargeback, I mean a -- a

9     refund, then -- or anything, if we didn't get paid

10    from the customer we didn't pay the room.

11        Q.    Okay.  But what if you got paid and then a

12    month later gave a refund, how would that be reflected

13    in this scheme?

14        A.    We would take it back from the room.

15        Q.    Okay.  And was it you who paid the room?

16        A.    Well, I mean, I don't know what you mean by

17    me.  Did I go and hand them a check or no?  I mean --

18        Q.    Did you write them a check, did you wire

19    them money?

20        A.    We wired money.

21        Q.    You say "we."  You mean --

22        A.    First Financial.

23        Q.    Okay.  And did you do that on behalf of

24    First Financial?

25        A.    I did.

1       Q.    And did anyone else do that on behalf of

2    First Financial?

3       A.    No.

4       Q.    Okay.  Who made -- you mentioned earlier

5    that there were records maintained as to the sales,

6    volume and refunds and things like that.  Do I have

7    that right?

8       A.    I don't know what you're asking.

9       Q.    I'm trying to figure out what records First

10   Financial maintained reflecting the number of sales

11   First Financial made.  Were such records maintained?

12      A.    Yeah.  I mean, I would imagine so.  They

13   are -- yeah.

14      Q.    Okay.  Where were they maintained?

15      A.    I would imagine, you know, a database.

16      Q.    And what database was that?

17      A.    The database that you came and took out of

18   our office.

19      Q.    I'm not familiar with what you're talking

20   about.

21      A.    Okay.

22      Q.    Was it a database that was located on your

23   computer?

24      A.    Excuse me?

25      Q.    Was it a database located on your computer?

1        A.      Yes.

2        Q.      Okay.  Was it located on any other computers

3    in your office?

4        A.      I don't know which computers everything was

5    on.  I would believe -- you know what?  I don't know.

6        Q.      But it was on your computer?

7        A.      No, I didn't have a computer in the office

8    there at the end.

9        Q.      Okay.  Well, let me come at this from a

10   different angle.

11       A.      Okay.

12       Q.      How would you know how much to pay the

13   telemarketing rooms?

14       A.      Okay.  Melinda, what you're asking me is two

15   different things.  You're asking me about right now

16   which is over a year after, and you're asking me about

17   what happened when I paid rooms 14 months ago and

18   longer.  So I'm trying to answer your questions.

19   You're asking me right now what's in the database or

20   how was it done or where -- and at this point --

21       Q.      What I asked you was whether First Financial

22   maintained a customer -- a list of customers who

23   purchased its products.

24       A.      Yes.

25       Q.      And you said that would be in the database.

1      A.      Yes.

2      Q.      Okay.   So my question is, where is the

3   database?

4      A.      The database is in the -- in the office

5   that -- again, that you seized.   If "seized" is the

6   right word.

7           MR. BERNETT:   Let's be clear here.   The

8        computers were removed by me and they were

9        returned by me.

10           THE WITNESS:   Okay.

11           MR. BERNETT:   They are there in --

12           THE WITNESS:   Okay.

13           MR. BERNETT:   The particular office was

14        never seized.   The particular office was

15        inventoried and the computers removed for a period

16        of time, but they were returned.

17           MR. COVE:   Understood, Mark.   Thank you.

18   BY MS. CLAYBAUGH:

19      Q.      So let's go back in time to some time say in

20   2010.   Let's get out of the present.   You know, there

21   seems to be some question on that.

22           In 2010 I'm just asking you in a typical

23   week when you would pay the telemarketing room, how

24   would you know how much to pay the room?

25      A.      We had -- you know, I ran reports that

1    showed me what a room would get paid.  It's not rocket

2    science.  I took 60 percent and I paid it to the room.

3         Q.    Okay.  And then you wired the money to the

4    room?

5         A.    That's correct.

6         Q.    Okay.  Now how much money -- what was your

7    take?

8         A.    My take of what?

9         Q.    Well, how much did you get paid?

10        A.    I don't know.  I think I furnished all my

11   tax returns.

12        Q.    Okay.  Well, did you get paid on a

13   percentage basis?

14        A.    Me personally?

15        Q.    Yes.

16        A.    No.

17        Q.    Okay.  Is that a strange question?

18        A.    To me, yes.

19        Q.    Okay.  So you paid 60 percent to the room.

20   What other expenses did you pay out?

21        A.    Payroll.

22        Q.    Okay.  And anything else?

23        A.    Rent, electric.  I mean, I can't go

24   through -- we -- you know, accounting, legal.  I don't

25   know.  I -- just typical -- fulfillment.  Typical

1    office expenses.

2         Q.    Okay.  Who performed your accounting?

3         A.    John Sullivan Accounting Services.

4         Q.    Okay.  Did the First Financial corporate

5    accounting?

6         A.    Yes.

7         Q.    Okay.  And I think you said that you also

8    paid for the additional packages to be mailed out, and

9    that was between $105 and $110 an order?

10        A.    That's correct.

11        Q.    Okay.  How much did you pay out to

12   fulfillment per order?

13        A.    That was fulfillment.

14        Q.    Okay.  I thought fulfillment from what you

15   said earlier was the actual negotiating service.  Are

16   they actually one in the same?

17        A.    Yes.

18        Q.    Okay.  So the $105 to $110 would cover

19   mailing the packages out on the front end and then

20   performing the negotiations on the back end, correct?

21        A.    Yes.

22        Q.    And would it also include mailing the budget

23   analyses to customers?

24        A.    Yes.

25        Q.    Okay.  And was that a flat rate that you

1    paid to fulfillment or did it fluctuate -- or was it

2    affected by refunds and chargebacks?

3         A.    I don't really recall.

4              MR. LORA:  Melinda, this is Hector.  I think

5         we've been going for about an hour, and I for one

6         need to take a restroom break soon.

7              MS. CLAYBAUGH:  Okay.

8              MR. LORA:  So just five minutes either now

9         or shortly.  It's up to you.

10             MS. CLAYBAUGH:  Now is fine, and I'll look

11        over my questions and try to weed some out.

12             (Thereupon, a short recess was taken, after

13        which the following proceedings were held:)

14   BY MS. CLAYBAUGH:

15        Q.    Mr. Balsamo, between the beginning of 2010

16   when First Financial began and March 2011 when you

17   claim it ended I guess or stopped selling product, how

18   many total clients did First Financial have?

19        A.    I don't know exactly.  That's stuff that,

20   you know, I gave off to other people, the

21   actual -- you know, that was not really my part of

22   daily work.

23        Q.    What do you mean, something you gave off to

24   other people?  Was it someone else's responsibility to

25   maintain the number of total clients?

1      A.    Yes.

2      Q.    Okay.  Whose responsibility was that?

3      A.    I don't know exactly but, you know -- yeah,

4    I don't know exactly who that would be.  I guess

5    whoever data entered for that day.

6      Q.    So would that -- but someone under your

7    direction, correct?

8      A.    Yes.

9      Q.    And did you receive reports about the total

10   number of clients on a regular basis?

11     A.    I think weekly.

12     Q.    And who prepared those reports?

13     A.    Prepared them?  I really don't -- I really

14   don't know.  I mean, it could have been different

15   people.  I really don't know.

16     Q.    Were any paper files kept for each customer?

17     A.    I believe so.

18     Q.    And what did those files consist of?

19     A.    They would be the file that we -- the fax

20   that we got from the room.

21     Q.    The fax that you got from the room --

22     A.    The call center.

23     Q.    -- about the sales?

24     A.    Yes.

25     Q.    Authorizing the sale I guess?

1      A.     It would be the pertinent information.

2   I -- I don't know exactly.

3      Q.     That you needed to bill the customer; is

4   that right?

5      A.     I would think so.

6      Q.     Okay.  And when the -- when customers

7   received their welcome package and filled it out and

8   mailed it to the fulfillment company, did you receive

9   a copy of that?

10     A.     No.

11     Q.     Okay.  So to your knowledge all those files

12  that were filled out by customers were maintained at

13  the fulfillment company?

14     A.     Yeah.  I think that I had people in charge

15  of handling scenarios like that and things like that.

16  So I really don't know all the fine detail of those

17  answers -- of those questions I mean.

18     Q.     Handling scenarios like that?

19     A.     You know, dealing with the day-to-day

20  operations.

21     Q.     Well, I'm just asking where the documents

22  are.  The copies of the papers that consumers filled

23  out, were the copies of them maintained at First

24  Financial?

25     A.     I believe so.

1      Q.     And where would those records be today?

2      A.     They would be in the office.

3      Q.     At Hudson?

4      A.     Yes.

5      Q.     Are there any First Financial records that

6    are not in the Hudson office today?

7      A.     Not that I'm aware of.

8      Q.     Now as -- I take it that you were the -- as

9    the person who set up the processing accounts

10   with -- what was that company name?  E something.

11     A.     EPayData?

12     Q.     Yes, EPayData.  That you -- you set up those

13   accounts.  And so were you the person who received

14   notifications as to chargebacks on those accounts?

15     A.     I usually delegated that out.

16     Q.     Okay.  But did you receive the information

17   in the first instance?

18     A.     I don't believe so.

19     Q.     Who would have received that?

20     A.     That would be Hank Waters.

21     Q.     Okay.  So the information -- let's make sure

22   I have this right.

23            If there was information about chargebacks

24   on the First Financial or Calif Management account,

25   that information would be sent directly to Hank

1    Waters?

2         A.    I believe that's true.

3         Q.    And then what would he do with it?

4         A.    Whatever needed to be done.  I don't know

5    how to answer that.  You know, he would handle it

6    however it needed to be handled.

7         Q.    Okay.  Would that include corresponding with

8    the ePayData company itself?

9         A.    I think that's true.

10        Q.    Would that include contacting customers?

11        A.    If they needed to be contacted.

12        Q.    And did he notify you as to the steps he was

13   taking to address the chargebacks?

14        A.    I'm sure he did.  Or I'm sure it's something

15   we discussed.

16        Q.    And did he need your authorization to handle

17   a chargeback in a particular way?

18        A.    No.

19        Q.    Would he have to do any paperwork relating

20   to the chargeback?

21        A.    No.

22        Q.    I know at some point First Financial

23   received a BBB complaint; is that right?

24        A.    I believe that's true.

25        Q.    And who was responsible for receiving the

1    complaints at First Financial?

2        A.    Hank Waters.

3        Q.    Okay.  And who responded to the BBB

4    complaints?

5        A.    Hank Waters.

6        Q.    Did you ever respond to a BBB complaint?

7        A.    Not that I recall.

8        Q.    Would you have given Hank Waters

9    authorization to respond under your name to the BBB

10   complaint?

11       A.    Would I have given him -- when you say under

12   my name, I don't know what you mean by under my name.

13   To sign my name?

14       Q.    Would he have authorization to call himself

15   Mr. Balsamo when corresponding with the BBB?

16       A.    No.  I don't think so.  I mean, I don't

17   know.  It depends on how you are directing that

18   question.  It's a pretty vague question.

19       Q.    Well, if I were to tell you that there are

20   BBB complaints with your name on them as the person

21   corresponding with the BBB, how would you explain

22   that?

23       A.    Yeah, I don't recall them.

24       Q.    Okay.  Well, that's why I was asking if it

25   was possible that someone else would have corresponded

1    on your behalf.

2         A.    I don't know.

3         Q.    Do you recall authorizing anyone to

4    correspond on your behalf with the BBB?

5         A.    Not that I recall right now.

6         Q.    Now, you mentioned that your wife had

7    applied for at one point an ePayData account; is that

8    right?

9         A.    I believe so.

10        Q.    For the processing of First Financial

11   customers, right?

12        A.    Right.

13        Q.    Okay.  Was she an employee of First

14   Financial?

15        A.    No, she wasn't.

16        Q.    Now the telemarketing room, to go back to

17   that for a minute, presumably they used a script to

18   sell the First Financial product; is that correct?

19        A.    I would assume.  I don't know.  I'm really

20   not sure if they -- I would imagine they used a

21   script.

22        Q.    Let me just clarify.  The First Financial

23   product is your company's product, correct?

24        A.    That's correct.

25        Q.    Okay.  So did you provide scripts to the

1    telemarketing room for them to use to market your

2    product?

3         A.    I would have -- I think I would have let

4    that be in counsel's hands setting that up.  I really

5    don't know how to answer that.  That's not something I

6    would have done myself.

7         Q.    And by "counsel" you mean who?

8         A.    I mean attorneys that I've used including

9    Hank.

10        Q.    Okay.  And would you have reviewed the

11   scripts before they were submitted to the

12   telemarketing room?

13        A.    I may have.  If they were actually

14   submitted.  I'm not saying they were actually

15   submitted to the telemarketing rooms.  I don't know if

16   we just reviewed and okayed or if we actually

17   submitted.  But like I said, that would have been

18   something done by counsel.

19        Q.    Did First Financial conduct any verification

20   recordings of their customers?

21        A.    We reviewed every -- every sale a

22   verification recording was reviewed.

23        Q.    Okay.  So who actually conducted the

24   verification recording?

25        A.    The sales room.

1      Q.     Okay.  And was that transmitted to First

2   Financial?

3      A.     I don't believe it was transmitted.  I

4   believe it was in a -- some kind of storage facility

5   or something that we had access to.

6      Q.     A storage facility online?

7      A.     Like a Cloud or something.

8      Q.     Okay.  So what was the procedure at First

9   Financial for reviewing the verification recording?

10      A.     We would call, listen to the recording, make

11   sure that our checklist of whatever we required or our

12   guidelines were met before we would purchase an order.

13      Q.     And so I'm just trying to get the chronology

14   down.  The telemarketing, was that while the client

15   was still on the phone or was this after?

16      A.     It was after.

17      Q.     Okay.  So let me see if I have this right.

18   The client would agree to pay money, the telemarketer

19   would write down or otherwise capture their billing

20   information and perform a verification recording which

21   First Financial would then review, and if it met your

22   criteria would go ahead and bill the customer; is that

23   right?

24      A.     Yes.

25      Q.     Okay.  Now, what were your criteria for

1    determining whether you would go ahead and purchase

2    that order?

3        A.    I don't have that in front of me, and it was

4    so long ago since I've seen one I couldn't tell you

5    what was on them or not on them at this point.

6        Q.    Did the telemarketers work off the

7    verification script?

8        A.    When you say "work off of," they --

9        Q.    Did they read a script when they performed

10   the verification recording?

11       A.    I don't know.  I wasn't there, so it would

12   be hard for me to answer if they did it out of memory

13   or through a script.

14       Q.    Did you listen to any of the verification

15   recordings personally?

16       A.    Maybe at the very beginning, but I really --

17   I can't recall reviewing them myself.

18       Q.    And whose job was it to review them?

19       A.    People in customer service.

20       Q.    You said that the verification recordings

21   were maintain in a Cloud computing kind of program?

22       A.    I think that's what it was.  That was an I

23   think.  I'm not 100 percent sure the technical terms

24   of where they were stored, but they were stored

25   off-site.  They weren't on our premises.

1      Q.     And do you remember the name of the program?

2      A.     I don't.

3      Q.     Was there a password -- was it password

4    protected --

5      A.     Yes.

6      Q.     -- to access the verification recordings?

7      A.     Yes.

8      Q.     Did anyone else aside from First Financial

9    have access to those recordings?

10     A.     I'm not sure if the room did or not.  I

11   mean, I'm not sure.

12     Q.     Okay.  Now what if, let's say hypothetically

13   that one of your employees listened to a recording and

14   it didn't meet whatever criteria First Financial had.

15   You mentioned earlier that you wouldn't accept that

16   order, correct?

17     A.     Correct.

18     Q.     Okay.  Would you or anyone else on your

19   behalf contact the telemarketing room to discuss the

20   failure to meet the criteria?

21     A.     Well, they would know it wasn't met because

22   they -- you know, they would get a report at the end

23   of the day stating that that order was not accepted.

24     Q.     Did you provide those records on a daily

25   basis?

1       A.      I didn't provide them at all, no.  They were

2    provided, but not by me.

3       Q.      They were provided by someone at First

4    Financial?

5       A.      Correct.

6       Q.      Okay.  And who provided those reports?

7       A.      I don't know.  Like I said, another -- you

8    know, these are just tasks of customer service.

9       Q.      Did you review them first before they went

10   to the telemarketing room?

11      A.      I didn't, no.

12      Q.      Now, the packages that were -- the packages

13   that are mailed out to the customer to sign up, for

14   them to fill out, were those packages -- you said they

15   were mailed by someone, by another party, correct?

16      A.      Yes.

17      Q.      But who actually printed the materials?

18      A.      I don't know where they were printed.  They

19   weren't printed by us.

20      Q.      Okay.  Did you pay someone to print them?

21      A.      No.

22      Q.      Well, how did the materials appear?  These

23   are First Financial materials, correct?

24      A.      The company that did the fulfillment printed

25   out -- you know, I guess printed them en masse.  When

1    they mailed them out, you know, they were printed out.

2        Q.    Okay.  So who provided the -- I guess the

3    template, the files from the fulfillment company to be

4    printed out?

5        A.    When you're saying the template or the

6    files?

7        Q.    How did the fulfillment have the materials

8    in its possession to mail them to the First Financial

9    customers?

10       A.    How did they have them?  I guess they had

11   them printed.

12       Q.    Okay.  And what did they -- did you request

13   that they be printed or did First Financial request

14   that they be printed?

15       A.    It was part of fulfillment, that they mail

16   out packages to the customers.

17       Q.    But fulfillment had to approve these

18   materials I take it to go out on behalf of First

19   Financial.

20       A.    Yeah.  I don't remember how that started,

21   you know, as far as the packages or stuff, how the

22   originals started, the packages.  I really don't

23   remember how they came to be.

24       Q.    Okay.  Is that something that you as

25   president of First Financial would have reviewed

1    before it was disseminated?

2         A.    I don't know if I would have reviewed them

3    alone or with counsel.  I don't know.  I really don't

4    remember that -- remember that, you know, ever dealing

5    with the packages.  It was a long time ago.

6         Q.    You don't remember how the packages bearing

7    First Financial's name that were mailed to consumers

8    came to be; is that right?

9         A.    Not that I can recall right now, that's --

10   yeah, I don't remember that right now.

11        Q.    Now, you said that First Financial stopped

12   -- or I'm not sure how you put it.

13              In March 2011 what happened to First

14   Financial?

15        A.    We stopped taking orders.

16        Q.    Okay.  And why was that?

17        A.    I don't know.  I think I -- I don't know.

18        Q.    You don't know why your company stopped

19   taking orders?  Is that your testimony?

20        A.    Well, that's kind of a broad question.  So

21   let me sit back and kind of think about it.  I'm

22   trying to of -- yeah.  Melinda, I think that a lot of

23   it had to do with us losing a merchant account.

24        Q.    Okay.  Was that the ePayData account?

25        A.    Yes.

1      Q.     And why did you lose that account?

2      A.     I don't know.

3      Q.     It was your account, correct, one that you

4   opened?

5      A.     Yeah, it was our account, yeah.

6      Q.     Okay.  So you were the one notified about

7   the account closing?

8      A.     I was.

9      Q.     Okay.  And do you recall what reason was

10  given for the account closing?

11     A.     That they were no longer doing interest rate

12  reduction programs.

13     Q.     Did you attempt to find another merchant

14  account?

15     A.     I believe I did.

16     Q.     And did you fill out -- submit applications

17  to other processors?

18     A.     I believe so.

19     Q.     And to whom did you submit applications?

20     A.     I don't remember.

21     Q.     And were any of those granted?

22     A.     I don't think so.  That's why we're not

23  there.

24     Q.     Okay.  So was that when you were located at

25  the U.S. 19 address?  Was that March 2011?

1       A.      Yes.

2       Q.      Okay.  And so what did you do with the

3  documents and equipment in that office?

4       A.      It all stayed in that office until we moved

5  to the new office.

6       Q.      Okay.  And when was that?

7       A.      That's I believe -- I believe it was July of

8  2011 or -- yeah.  July -- in the neighborhood of July

9  2011.  Possibly August.

10      Q.      Okay.  And are there currently any employees

11  of First Financial?

12      A.      Right now, now.

13      Q.      Well, were there employees three weeks ago?

14      A.      Yes.

15      Q.      Okay.  And how many employees did First

16  Financial have at that time?

17      A.      I think we just had one left.

18      Q.      And who was that?

19      A.      Sissy Boutin.

20      Q.      And what was her responsibility at the

21  company?

22      A.      Customer service.

23      Q.      Okay.  And what would that include?

24      A.      General office -- you know, I mean you've

25  got to remember this was -- you know, it was over a

1    year -- we are talking about a year later now.  We

2    weren't getting a lot of calls.  So I think a lot of

3    it was playing computer games to be honest with you

4    the last few months.

5        Q.    Okay.  So if a customer, let's say, who had

6    purchased from First Financial, you know, a year and a

7    half ago had -- called in with a question or

8    complaint, this person Sissy would handle that call?

9        A.    Yes.

10       Q.    Now, what if a customer wanted to know about

11   the status of negotiations and whether they were

12   ongoing, would Sissy also handle that call?

13       A.    Yes.

14       Q.    And what information would she review to

15   answer that call?

16       A.    I don't know.

17       Q.    Well, was there a database?  Would she ever

18   have used a database?

19       A.    Yeah.  Melinda, if we are going back

20   this -- I just want to try to explain myself so that

21   you have -- so that we both are on the same page.  As

22   of a year ago we were getting virtually minimal calls

23   at this point.  So I wasn't there for the day-to-day

24   operations anymore because, you know, you could sit

25   there all day and not get a call because we were

1    closed for so long.  So when you're asking specific

2    questions right now, I'm trying to be as -- you know,

3    helpful to you as I can but, you know, I'm going to

4    keep going back to this was a long time ago.  And then

5    the last few months or more than a few I've had very

6    little to do with that office.

7        Q.    Were you still paying Sissy?

8        A.    Yes.

9        Q.    Okay.  How much was she getting paid?

10       A.    About $500 a week.

11       Q.    And from what account was she being paid?

12       A.    First -- the same First Financial account

13   that I was telling you about before for payroll.

14       Q.    And how often would you say you were at the

15   office there?

16       A.    Once a week.

17       Q.    Was she conducting any interest rate

18   negotiations for First Financial customers?

19       A.    No.

20       Q.    And is First Financial presently engaged in

21   any business aside from maintaining this one employee

22   to perform customer service for the interest rate

23   reduction customers?

24       A.    No.

25       Q.    Did you ever listen in to the outbound

1       telemarketing calls offering First Financial services?

2       A.      No.

3       Q.      Did you take any steps to review the work of

4       the telemarketers and determine, you know, how well

5       they were selling your product?

6       A.      Yeah, that would be a question for -- that

7       wasn't something that I paid a lot of attention to.  I

8       had other people do things like that.

9       Q.      Who did that?

10      A.      I believe Hank that would have been in

11      charge of that.

12      Q.      And where were these telemarketing rooms

13      located?

14      A.      I believe that we -- they were kind of

15      scattered about.  I believe we had some in the Orlando

16      area maybe.  Not maybe.  I know we did.  And Georgia.

17      That's what I can remember right now.

18              (Thereupon, a short recess was taken, after

19          which the following proceedings were held:)

20      BY MS. CLAYBAUGH:

21      Q.      I think I only have a few more questions.

22              Mr. Balsamo, were you aware of -- were you

23      made aware of the substance of customer complaints --

24      A.      By the --

25      Q.      -- against First Financial?

1     A.    No.  I pretty much had people in charge of

2     that.

3     Q.    What were the names of people in charge of

4     that?  You mentioned Hank Waters.

5     A.    Yep.

6     Q.    Anyone else?

7     A.    Just the customer service department.  They

8     were qualified people to do their job so --

9     Q.    Were you made aware of the rates at which

10    the fulfillment center successfully negotiated

11    consumers' credit card rates?

12    A.    No.

13    Q.    You were not made aware of the results that

14    were obtained by the fulfillment --

15    A.    Well, not that I can remember right now.

16    Q.    But was there a regular report made to you

17    about those -- the success rates?

18    A.    Not that I recall.  Again, Melinda, you've

19    got to remember I had people in their places and I

20    kind of just was -- you know, I had people in their

21    places to do their job, and they did.

22    Q.    I hear that.  But you're the president of

23    the company, correct?

24    A.    Yes.

25    Q.    And you were directing everyone to work for

1      First Financial, correct?

2          A.     I mean, if you want to use the word

3      directing.  I think that, you know, I hired competent

4      people to do their job, some of them better than I at

5      what we asked them to do.  So that's why you hire

6      people.

7          Q.     Did you do the hiring?

8          A.     I did some.

9          Q.     And who else would have done the hiring?

10         A.     Hank would have done the hiring.  You know,

11     at the very beginning did, but as we grew I delegated

12     most responsibility.

13         Q.     Okay.  Now, you mentioned Hank Waters.  Is

14     he an employee of First Financial or was he?

15         A.     No.

16         Q.     Okay.  What is his relationship with First

17     Financial?

18         A.     He was legal counsel.

19         Q.     Okay.  Anything else?

20         A.     No.

21         Q.     So was -- I assume that --

22         A.     Well when I say "no", let me put that back.

23     He would have been -- I'm trying to think of the right

24     word to use.  Compliance.  He would have been our

25     compliance director.

1        Q.     Compliance of what?

2        A.     Anything that needed to be complied with.

3    Legal compliance, any complaints.

4        Q.     And I take it that you paid him legal fees

5    for these services, correct?

6        A.     I did.

7        Q.     Did he receive any other money from the

8    operations?

9        A.     What do you mean by other monies?

10       Q.     Well so, for example, the telemarketing room

11   got I think you said 50 to 60 percent.  Did Mr. Waters

12   get paid a percentage of the money earned by First

13   Financial?

14       A.     No, he did not.

15       Q.     And I honestly can't remember if I asked you

16   this already.  How much money did you take from First

17   Financial?

18       A.     I don't remember, but it's on the tax

19   reform -- the tax form -- tax return that I provided

20   you.

21       Q.     That's right.  And you said you did not have

22   a set percentage, right?

23       A.     No, I did not.

24       Q.     So aside from fees for legal services, it's

25   your testimony that Mr. Waters did not receive any

1    additional monies from First Financial?

2        A.    No, he did not.

3              MR. LORA:  Yes, that is my testimony.

4              THE WITNESS:  Oh, that is my testimony.

5    BY MS. CLAYBAUGH:

6        Q.    Now, you mentioned at the very beginning

7    that there were other services, other programs that

8    went along with the interest rate reduction program;

9    is that right?

10       A.    Yes.

11       Q.    Okay.  And what were those services?

12       A.    You know, those I -- I wasn't heavily

13   involved in that.  That was mostly attorneys involved

14   in that so I don't recall them all.  And again, you

15   know, I'm going to go to that long time ago when all

16   this was being constructed and put together.  So I

17   don't have a lot of recollection on that.

18       Q.    But were you one of the people who

19   constructed and put together these programs?

20       A.    Was I -- did I conduct and -- I don't know

21   what you mean by construct and put together.  And I'm

22   not trying to evade the question

23       Q.    I'm asking what you mean by that.  I'm using

24   the word you just used.

25       A.    Back up on second.  Can you just rephrase.

1    Ask me one more time what you're asking.

2         Q.    Okay.  I'm trying to find out about the

3    other programs that were sold alongside or as part of

4    the interest rate reduction program.

5         A.    Okay.

6         Q.    Okay?

7         A.    Yes.

8         Q.    Okay.  Now, my question -- one of my

9    questions is what other services were offered in

10   connection with the interest rate reduction program?

11        A.    Yeah, there was some kind of discount legal

12   service, there was identification theft services, but

13   I don't recall them all.  Those are two that I do

14   recall though.

15        Q.    Okay.  Now for the two that you do recall,

16   who actually provided those services?

17        A.    I don't know.  Again, it's going back a long

18   time and I forgot -- I don't know where or who

19   provided those services.

20        Q.    Well, wouldn't it be the case that First

21   Financial would have to pay those providers for the

22   services that they are providing to First Financial's

23   customers?

24        A.    Yes.

25        Q.    Okay.  So do you recall making payments to

1    either a discount legal service provider or an ID

2    theft service provider?

3         A.    No.   I don't recall making those payments.

4         Q.    Would there be contracts reflecting First

5    Financial's relationship with those entities offering

6    discount legal services or ID theft services?

7         A.    Yeah.   Melinda, these were done through

8    counsel so this is -- I don't have the answers to

9    these questions.

10        Q.    And when you say "counsel", you mean

11   Mr. Hank Waters; is that right?

12        A.    Yes.

13        Q.    Now, you mentioned that First Financial

14   effectively or I guess stopped selling its product

15   after around March 2011, correct?

16        A.    Yes.

17        Q.    Okay.   Now after that date, would any First

18   Financial materials have been mailed to customers

19   after that time?

20        A.    I don't believe so.   Not new customers

21   anyway.

22        Q.    Okay.   But it's possible that materials

23   would be mailed out to existing First Financial

24   customers?

25        A.    I mean, if somebody called in and said they

1    didn't receive a package I could see that happening.

2    But that's the only scenario that I could see that

3    happening in.

4        Q.    Have you paid for fulfillment services after

5    March 2011?

6        A.    No, I did not.

7        Q.    So even though a customer might request an

8    additional, let's say, budget analysis, you would not

9    have to pay fulfillment for that?

10        A.    No.  Once we paid them that -- you know, we

11    paid them, they were paid.

12        MS. CLAYBAUGH:  All right.  I think that's

13        all the questions I have.  I don't know if anyone

14        else has questions.

15        MR. LORA:  I don't have any questions on

16        cross at this point in time.

17        MR. ECKARD:  This is Robert Eckard.  I don't

18        have any questions either.

19        MR. BERNETT:  This is Mark Bernett.  I've

20        got a couple, but I'd like to talk to Mr. Lora

21        separately first if that's okay.  If he can call

22        me?

23        MR. ECKERD:  Do you want me to hang on the

24        line, Mark?

25        MR. BERNETT:  I want to talk to Mr. Lora

1          separate.  Just hang on while I talk to him.  Call

2          me on my cell, Hector.

3               MR. ECKARD:  Then Melinda will give the read

4          or waive instruction.  I want to make it clear on

5          the record that I very likely may ask a couple of

6          questions after I speak to Mr. Lora.

7               MR. LORA:  Okay.  Hold on.  Let me step out.

8           I'm going to call Mark, and then I'll be right

9          back.

10              (Thereupon, a short recess was taken, after

11         which the following proceedings were held:)

12                     CROSS-EXAMINATION

13    BY MR. BERNETT:

14         Q.    Mr. Balsamo, I'm Mark Bernett.  I'm the

15    receiver in the case.  I was the one who took your

16    computers out of your office for a few days, and they

17    have been returned.  Can you confirm that?  Do you

18    know that?

19         A.    I don't know that.

20         Q.    Okay.  Have you spoken to Mr. Sullivan who

21    was there when I redelivered them?

22         A.    I have not.

23         Q.    Take my word for it.  They are there.

24         A.    I do.  Thank you.

25         Q.    Mr. Balsamo, First Financial was essentially

1    the customer service part of the telemarketing

2    operation.  You didn't do telemarketing, but you did

3    the customer service aspect of it; is that correct?

4         A.    Yes.

5         Q.    And customer service from what I understand

6    from your testimony was involved first of all in

7    verifying that the sales made by the telemarketing

8    room was done properly; is that correct?

9         A.    Yes, that they followed the guidelines of

10   verification, yes.

11        Q.    And then also to deal with any issues that

12   may be raised by the customers after the sale was

13   completed; is that correct?

14        A.    Yes.

15        Q.    Tell me how First Financial selected the

16   telemarketing rooms with which it chose to do

17   business.

18        A.    Once we got the first room, which I forget

19   the name of it, but they were based out of Orlando,

20   you know, I guess words just gets around that we were

21   doing what they considered a good job and other rooms

22   asked us if we would accept some of their orders.

23        Q.    Who were these rooms owned by?

24        A.    Again, Mark, we are going back a long time

25   and I just don't remember their names.

1       Q.    One room was called Atlanta.  Did you deal

2    with that one?

3       A.    One room was called what?

4       Q.    Atlanta.  It wasn't located in Atlanta but

5    it was in the Orlando area.  Do you recall a room

6    named Atlanta?

7       A.    No, I don't.

8       Q.    Do you recall a room named Panama?

9       A.    No, I don't.

10      Q.    Do you know how many rooms First Financial

11   actually worked with?

12      A.    Four or five or six.  Somewhere around

13   there.  I don't think ever any more than six.

14      Q.    Were there contracts between you, First

15   Financial and these various rooms?

16      A.    If there were, that's something that I would

17   president have been involved in.  That would have been

18   something I would have had attorneys involved with.

19   So I don't recall if we ever had contracts with them

20   or not.

21      Q.    You spoke about attorneys in the pleural and

22   you've identified Mr. Waters as one of our attorneys.

23   Were there others?

24      A.    Yeah, there were.

25      Q.    Who were they?

1      A.      Dusty -- his last name was Gahagan.

2              MR. LORA:  Spelled G-A-H-A-G-A-N.

3   BY MR. BERNETT:

4      Q.      Where is he located?

5      A.      Montana.

6      Q.      Was he located in Montana when you started

7   using him?

8      A.      Yes, he was.

9      Q.      How did you come to learn of Mr. Gahagan?

10     A.      Through Hank Waters.

11     Q.      And Mr. Waters is actually located in North

12  Carolina; is that correct?

13     A.      That's correct.

14     Q.      What other lawyers did First Financial use?

15     A.      I think that's it.

16     Q.      The outgoing wires that you made to these

17  various call rooms, do they reflect the names of the

18  call rooms?

19     A.      I don't know.  I don't remember.  It's been

20  a long time, Mark, since I've done a wire.  It's been

21  well over a year I believe since I've done a we are.

22     Q.      But there were only five or six, and you

23  made the wires on a weekly basis?

24     A.      But it was set up on a computer, and I put

25  in the numbers and sent it away.

1     Q.    But you don't remember who you sent it?

2     A.    I entered it into the computer one time, and

3  after that was it was putting in the dollar amount and

4  sending it off.

5     Q.    Who was the bank that you used?  In other

6  words, when you sent the wire what was your bank from

7  whom you sent the funds?

8     A.    I believe Bank of America.

9     Q.    That was in a First Financial account?

10    A.    Either First Financial or Calif Management.

11    Q.    Or Calif Management.

12          Now as I understand, the TRO has frozen some

13  funds in an account owned by either Calif Management

14  or First Financial; is that correct?

15    A.    Yeah, you have.

16    Q.    Mr. Balsamo, when you said "you all" -- you

17  all is in quotes Ms. Court Reporter -- the reality is

18  that the TRO which had the effect of freezing the

19  accounts is the very same document, the court order

20  which caused me to come into existence.  So just to be

21  clear, I didn't freeze the bank accounts.  The TRO

22  did.

23          In the TRO, all of the receivership

24  defendants, I believe, if not all defendants are

25  required to provide financial information to the

1    Federal Trade Commission and to me.  I understand you

2    have done that, Mr. Balsamo, provided such information

3    to the Federal Trade Commission?

4        A.    I have.

5        Q.    Okay.  Your attorneys I think -- we spoke

6    privately.  I think they said that they'll see that I

7    get copies, too.

8            MR. LORA:  Mark, while I've got you on the

9        phone, give me your fax number.

10           MR. BERNETT:  813-229-3323.

11           MR. LORA:  I'll fax you the financials for

12       First Financial Asset and Mr. Balsamo as soon as

13       we are done here.

14           MR. BERNETT:  Thank you.

15   BY MR. BERNETT:

16       Q.    Thank you.  Mr. Balsamo, in terms of

17   fulfillment with regards to products where you did the

18   customer service, the interest rate reduction product,

19   what was the name of the company that actually

20   performed the fulfillment services?

21       A.    I'm not 100 percent sure, Mark.  Again, a

22   long time ago.

23       Q.    Consumer credit group?

24       A.    It's possible.

25       Q.    Do you know Dale Robinson?

```
1          A.     Met him once or twice.

2          Q.     Was Mr. Robinson's company the one that was

3   providing customer service for your products?

4          A.     Customer service?

5          Q.     No, I misspoke.

6                 Was Mr. Robinson's company the one that was

7   providing fulfillment services for your company, First

8   Financial?

9          A.     I don't know whose company it was.

10         Q.     Well, was Mr. Robinson involved?

11         A.     I have no idea.

12         Q.     When you met --

13         A.     I didn't know every employee or every person

14  involved in the company I don't think.  I really don't

15  know.

16         Q.     Where was the fulfillment company physically

17  located that your company utilized?

18         A.     I don't remember exactly where.  I was there

19  only one time.

20         Q.     Was it near Hudson?

21         A.     I think it was more in the Clearwater kind

22  of area.

23         Q.     Do you know Clarissa Dyer?

24         A.     I think I met her once or twice.

25         Q.     Did Ms. Dyer's company or business provide
```

1    fulfillment services?

2        A.    I think that she was part of the company,

3    but I don't know her role in the company.

4        Q.    Did Mr. Fisher introduce you to Ms. Dyer or

5    Mr. Robinson?

6        A.    Introduce me?

7        Q.    Yes.

8        A.    No.

9        Q.    Do you know Brett Fisher?

10        A.    Yes, I do.

11        Q.    How do you know him?

12            MR. ECKARD:   I'm going to object to the form

13        of the question as the question calls for

14        attorney/client privilege.   You can answer the

15        question unless that answer you're about to give

16        would reveal an attorney-client communication.

17    BY MR. BERNETT:

18        Q.    My point was that I certainly respect

19    Mr. Eckard's concerns about his attorney/client

20    privilege involving communications perhaps with

21    Mr. Eckard, Mr. Fisher, Mr. Balsamo and Mr. Balsamo's

22    attorneys certainly in connection with preparation for

23    this deposition and this lawsuit, but that's not what

24    I'm asking.   What I'm asking is what was the

25    circumstance under which you met Mr. Fisher?

1          MR. ECKARD:  My objection stands, but

2      obviously I'm not instructing the witness not to

3      answer but he'll have to use his own discretion.

4          MR. COVE:  If that meeting involved legal

5      advice, don't discuss that advice.  But you can

6      discuss the circumstances.

7          THE WITNESS:  What meeting?

8          MR. COVE:  With Mr. Fisher.  What were the

9      circumstances in which you met him?

10          THE WITNESS:  Who remembers?

11          MR. COVE:  If you don't remember, that's

12      your answer.

13          THE WITNESS:  Mark, I don't remember the

14      first time I met Brett or the circumstances of it.

15  BY MR. BERNETT:

16      Q.   Did you know him from being involved in the

17  telemarketing business somehow?

18      A.   It was probably through mutual people that

19  we had -- I really can't recall the first time -- I

20  don't know the answer to that.  And to say it was, you

21  know, telemarketing related, I would think not.

22      Q.   Did Mr. Fisher help you to locate the call

23  rooms with which First Financial did business?

24      A.   When you say locate call rooms, we never

25  went out and -- I never recruited a call room in my

1    life.

2         Q.    They always called you?

3         A.    They did.

4         Q.    They said you've got a merchant account and

5    we are trying to sell this product, if we sell it will

6    you buy it from us?

7         A.    Yes.

8         Q.    Is that basically how it worked?

9         A.    Yes.

10        Q.    Okay.  Do you know Nick Nicholson?

11        A.    I've met Nick.

12        Q.    When was the last time you spoke to

13   Mr. Nicholson?

14        A.    Years ago.  Or at least a couple years ago.

15        Q.    Have you corresponded with him by e-mail in

16   the last year?

17        A.    No.

18              MR. BERNETT:  All right.  I don't have any

19        more questions.

20              MR. LORA:  I have nothing on cross.

21              MR. ECKARD:  Nothing on cross.

22              MR. LORA:  I think we are finished.

23              MS. CLAYBAUGH:  Yes.

24              MR. LORA:  Okay.  Unless you guys need to

25        speak to me, we are going to sign off.

1                MR. ECKARD:  I'll take a rough.

2                MR. LORA:  I think we will, too.

3                MR. ECKERD:  You can send me an invoice or

4        an e-mail if you need that information.  I

5        represent defendants Pro Credit Group and Brett

6        Fisher.

7                THE REPORTER:  Give me your e-mail address.

8                MR. ECKARD:  Robert@roberteckardlaw.com.

9                MR. BERNETT:  I assume FTC will get a rough,

10       and we'd like a rough also.

11               MR. LORA:  As do we.

12                        - - -

13               (Thereupon, the taking of the deposition was

14       concluded, and reading and signing were waived, at

15       1:52 p.m.)

16

17

18

19

20

21

22

23

24

25

```
1        C E R T I F I C A T I O N   O F   R E P O R T E R

2     CASE TITLE:   FTC V. PRO CREDIT GROUP, LLC, et al

3     DATE:   APRIL 12, 2012

4

5

6              I HEREBY CERTIFY that the transcript

7     contained herein is a full and accurate transcript of

8     the notes taken by me at the deposition on the above

9     cause to the best of my knowledge and belief.

10

11

12                         DATED:   4/12/2012

13                         MICHELE ANZIVINO, COURT REPORTER

14

15

      C E R T I F I C A T I O N   O F   P R O O F R E A D E R

16

17             I HEREBY CERTIFY that I proofread the

      transcript for accuracy in spelling, hyphenation,

18    punctuation and format.

19

20                         MICHELE ANZIVINO, Court Reporter

21

22

23

24

25
```