# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

FEDERAL TRADE COMMISSION,

     Plaintiff,

   v.

PRO CREDIT GROUP, LLC,
a Florida limited liability company,

BRETT FISHER, individually and as an
officer, owner, director, member, or manager
of Pro Credit Group, LLC,

SANDERS LEGAL GROUP, P.A.,
a Florida corporation,

SANDERS LAW, P.A.,
a Florida corporation,

ANDRE KEITH SANDERS, individually
and as an officer, owner, director, member,
or manager of Sanders Legal Group, P.A., and My
Success Track, LLC,

MY SUCCESS TRACK, LLC,
a Florida limited liability company,

CONSUMER CREDIT GROUP, LLC,
a Florida limited liability company,

DALE ROBINSON, individually and as an
officer, owner, director, member, or manager
of Consumer Credit Group, LLC,

FIRST FINANCIAL ASSET SERVICES, INC.,
a Florida corporation, and

**Case No.  8-12-cv-00586-MSS-EAJ**

FIRST AMENDED
COMPLAINT FOR
INJUNCTIVE AND OTHER
EQUITABLE RELIEF

Attachment A

WILLIAM BALSAMO, individually and as an officer, owner, director, member, or manager of First Financial Asset Services, Inc.,

   Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6101 *et seq.*, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC is charged with enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in

Attachment A

or affecting commerce.  Pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, the

FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive

and abusive telemarketing acts or practices.

5.     The FTC is authorized to initiate federal district court proceedings, by its

own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such

equitable relief as may be appropriate in each case, including rescission or reformation of

contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten

monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6.     Defendant Pro Credit Group, LLC ("PCG") is a Florida limited liability

company with its principal place of business at 601 Cleveland Street, Suite 390,

Clearwater, FL 33755.  PCG transacts or has transacted business in this district and

throughout the United States.

7.     Defendant Brett Fisher is the sole corporate manager of PCG.  At all times

material to this Complaint, acting with knowledge, alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts

and practices of PCG, Sanders Legal Group, P.A., My Success Track, LLC, and

Consumer Credit Group, LLC, including the acts and practices set forth in this

Complaint.  Defendant Fisher, in connection with the matters alleged herein, transacts or

has transacted business in this district and throughout the United States.

8.     Defendant Sanders Legal Group, P.A. ("Sanders Legal") is a Florida

corporation with its primary place of business at 601 Cleveland Street, Suite 390,

Attachment A

Clearwater, FL 33755.  Sanders Legal transacts or has transacted business in this district and throughout the United States.

9.      Defendant Sanders Law, P.A. is a Florida corporation with its primary place of business at 5922 9th Avenue North, Suite C, 2nd Floor, St. Petersburg, FL 33710. Sanders Law, P.A. transacts or has transacted business in this district and throughout the United States.

10.      Defendant My Success Track, LLC ("MST") is a Florida limited liability company with its principal place of business at 601 Cleveland Street, Suite 390, Clearwater, Florida 33755.  MST transacts or has transacted business in this district and throughout the United States.

11.      Defendant Andre Keith Sanders is the President and sole officer of Sanders Legal and Sanders Law, P.A.  He also has been a corporate manager of MST.  At all times material to this Complaint, acting with knowledge, alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sanders Legal, Sanders Law, P.A., and MST, including the acts and practices set forth in this Complaint.  Defendant Sanders, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

12.      Defendant Consumer Credit Group, LLC ("CCG") is a Florida limited liability company with its principal place of business at 2300 Tall Pines Drive, #125, Largo, FL 33771.  CCG transacts or has transacted business in this district and throughout the United States.

4

Attachment A

13.     Defendant Dale Robinson is a corporate manager of CCG and has held himself out as the President of CCG.  At all times material to this Complaint, acting with knowledge, alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of CCG, including the acts and practices set forth in this Complaint.  Defendant Robinson, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     Defendant First Financial Asset Services, Inc. ("First Financial") is a Florida corporation with its principal place of business at 10220 US 19, Suite 420, Port Richey, FL 34668.  First Financial transacts or has transacted business in this district and throughout the United States.

15.     Defendant William Balsamo is President of First Financial.  At all times material to this Complaint, acting with knowledge, alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of First Financial, including the acts and practices set forth in this Complaint.  Defendant Balsamo, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

16.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

Attachment A

## COMMON ENTERPRISE

17.     Defendants PCG, Sanders Law, P.A., MST, CCG, and First Financial have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have shared business functions, office locations, phone numbers, and advertising, and that held themselves out to consumers as the same company.  Because these defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Fisher, Sanders, Robinson, and Balsamo have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of PCG, Sanders Law, P.A., MST, CCG, and First Financial that constitute the common enterprise.

## DEFENDANTS' UNFAIR AND DECEPTIVE BUSINESS ACTIVITIES

### *Debt Processing Activities*

18.     From approximately January 2010 to at least August 2011, Defendants PCG, Fisher, Sanders Legal, and Sanders (collectively, "Debt Processing Defendants"), working closely with overseas call centers, engaged in a scheme to defraud consumers through the processing of payments for debts that consumers do not actually owe, or that are never applied to consumers' real debts.  The scheme targeted consumers who had previously applied for or received loans from online payday loan companies.

19.     Callers based overseas contacted consumers and told them that they were delinquent on a payday loan or another debt.

Attachment A

20.     Callers often claimed that they were law enforcement officers or lawyers, or affiliated with law enforcement authorities.

21.     Callers further threatened consumers they would face arrest or legal action if they failed to pay immediately.

22.     In numerous instances, the callers possessed consumers' private personal information, such as their Social Security Numbers or addresses, and recited such information, convincing consumers that they were legitimate debt collectors and that consumers must pay the purportedly delinquent debts.

23.     Many consumers paid the purported debts as instructed because they were afraid of the threatened repercussions of failing to pay.

24.     Once consumers agreed to pay, Debt Processing Defendants processed such payments through merchant accounts they controlled under the name Sanders Legal Group.  The payments appeared on consumers' bank and credit card statements with the billing descriptor "Sanders Legal Group" or a similar name, and a phone number associated with Sanders Legal.  Sanders Legal also mailed receipts to consumers reflecting their payments.

25.     Many consumers attempted to obtain refunds from Debt Processing Defendants by calling the phone number associated with Sanders Legal Group on the billing descriptor and receipt.  In some instances, representatives of Sanders Legal were abusive toward consumers who requested refunds.

26.     Debt Processing Defendants processed at least $5 million in bogus charges for overseas debt collectors.

Attachment A

27.     Debt Processing Defendants fielded complaints from consumers about the abusive practices of the overseas callers, including that they posed as attorneys and called consumers repeatedly.  Consumers also complained that they did not owe the money sought by the callers.

28.     Debt Processing Defendants were notified of and responded to consumer complaints filed with the Better Business Bureau of Clearwater, Florida.  In these complaints, consumers reported that callers threatened to arrest or file legal actions against them if they did not pay alleged debts immediately.  Consumers also complained that they did not owe the money the callers sought and that the money they paid was not applied to the debts they did owe, as the callers claimed it would be.

29.     In August, 2010, Debt Processing Defendants were contacted by a U.S. Secret Service agent conducting a criminal investigation stemming from complaints from consumers charged by Sanders Legal after receiving threatening telephone calls. According to the agent, during these calls, consumers were threatened with arrest and/or legal action if they did not immediately make payments on fictitious loans.

30.     Despite knowledge of consumer complaints and of a criminal investigation, Debt Processing Defendants continued processing debt payments for overseas debt collectors without contracts or other proof demonstrating the debt collectors' rights to collect the debts.

31.     Based on the information in Paragraphs 27 through 30, Debt Processing Defendants knew or should have known that the payments they processed were for debts

8

that consumers did not owe or that the payments they processed were not applied to debts consumers actually owed.

32.     Despite their knowledge of the overseas callers' abusive practices, Debt Processing Defendants continued processing payments consumers made in response to these practices for months.

### *Interest Rate Reduction Activities*

33.     Since at least January 2010, Defendants PCG, Fisher, Sanders Law, P.A., MST, Sanders, CCG, Robinson, First Financial, and Balsamo (collectively, "Interest Rate Reduction Defendants") have engaged in a scheme to defraud consumers by telemarketing a service that purports to lower the interest rates on consumers' debts.

34.     In numerous instances, Interest Rate Reduction Defendants have initiated or caused others to initiate telemarketing calls through a service that delivers prerecorded voice messages, known as "voice broadcasting" or "robocalling." The prerecorded messages have purported to be from "Rachel" at "Cardholder Services" and have not identified the actual seller. The messages have offered consumers the purported opportunity to secure lower credit card interest rates and have instructed consumers to press a number on their phone to be connected to a live representative. In numerous instances, the prerecorded messages have been delivered to persons who had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such person.

Attachment A

35. In numerous instances, Interest Rate Reduction Defendants have represented to consumers that they are affiliated, or have established relationships, with consumers' lenders.

36. Interest Rate Reduction Defendants' representatives have claimed they will negotiate directly with consumers' creditors to reduce consumers' interest rates. They have routinely promised that they will obtain specific, substantially lower, interest rates for consumers, such as "3%," "6 to 9%," or interest rates in the "single digits." They have further promised that consumers will realize a minimum amount of savings – typically, thousands of dollars – and that such savings will occur within a specific timeframe, generally within 3 months.

37. Interest Rate Reduction Defendants' telemarketers also have stated that consumers who sign up for interest rate reduction services will receive assistance from personal financial consultants.

38. Additionally, in many instances, the telemarketers have stated that if consumers do not see the promised results they will receive full refunds.

39. Interest Rate Reduction Defendants generally have charged between $695 and $995 for their negotiation service and consumers have been obligated to pay the entire fee before receiving any services.

40. After consumers have paid the fee, Interest Rate Reduction Defendants have sent consumers a package of documents that typically has included some or all of the following:

Attachment A

a.      A welcome letter on the letterhead of the "Law Office of Sanders Law, P.A." that claims they will "help you take the first steps toward lowering your interest rates and getting out of debt 3 to 5 times faster" because they "work with your credit card companies to help lower your interest rates . . .";

b.      A flier for "My Success Track," a company that has purported to provide legal, financial, and other services;

c.      A "Mission Statement" that states that if the company does "not provide a substantial savings in interest and finance charges, you will receive a full refund and still get to keep the rates that we negotiated on your behalf";

d.      A flier entitled "Frequently Asked Questions" that states:  "We simply and aggressively negotiate with your creditor(s) to provide you lower interest rates!"; and

e.      A flier with customer testimonials, such as:  "With the service my consultant was able to get two of my accounts to 0% interest."

41.      The package also has included an "Account Information Form" and a "Client Data File and Authorization Letter."  Consumers have completed the first form by providing detailed information about their outstanding debts, including mortgages, student loans, medical bills, and credit cards.  By signing the second form, consumers have given Interest Rate Reduction Defendants permission to communicate with their creditors "for the sole purpose of negotiating lower interest rates."

42.      Consumers who have completed and returned the Account Information Form have received in the mail a "customized budget plan."  The "plan" has not reflected

Attachment A

the promised lower interest rates.  Rather, it has contained only the commonsense advice that paying more than the minimum monthly payments results in paying off debts more quickly than simply continuing to make minimum monthly payments.

43.     Despite their promises on the phone and in the mailed materials, in numerous instances, Interest Rate Reduction Defendants have not negotiated lower interest rates for consumers.  Indeed, some consumers have learned from their credit card companies that Interest Rate Reduction Defendants never contacted them.  In those instances in which Interest Rate Reduction Defendants have negotiated lower rates, such rates often were temporary.  Accordingly, consumers have not saved thousands of dollars from Interest Rate Reduction Defendants' negotiations, as promised.

44.     Many consumers who have attempted to contact Interest Rate Reduction Defendants to complain and seek refunds encounter obstacles such as busy signals, messages stating that the call is "out of range," or no answer.  When consumers have been able to leave messages, their calls often were not returned.

45.     Those few consumers who have finally spoken to representatives typically were told to wait a few more months to see results or that the debt "plan" was actually what Interest Rate Reduction Defendants promised to provide consumers, not lower interest rates.  Consumers have been unable to speak with, or even learn the identities of, their so-called personal financial consultants.

46.     Even when consumers have waited longer to see results, the Interest Rate Reduction Defendants have failed to negotiate lower interest rates.

Attachment A

47.     Interest Rate Reduction Defendants have denied many consumers the full refunds they have promised.  In many instances, consumers have only received refunds after making repeated requests to the Interest Rate Reduction Defendants or after complaining to, or threatening to complain to, the Better Business Bureau or law enforcement authorities.  Of those consumers who have received refunds, many received only half of their initial payment or less.

## VIOLATIONS OF THE FTC ACT

48.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

49.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

50.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT ONE

### *Unfair Acts or Practices of Debt Processing Defendants*

51.     In numerous instances, Debt Processing Defendants' acts and practices in connection with processing payments for debts consumers did not owe, or that were not applied to consumers' real debts, as discussed in Paragraphs 18 to 32, have caused or are likely to have caused substantial injury to consumers which is not reasonably avoidable by consumers themselves and which is not outweighed by countervailing benefits to consumers or competition.

13

Attachment A

52.     Therefore, Debt Processing Defendants' acts and practices, as described in Paragraph 51, are unfair and violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

### Deceptive Acts or Practices of Interest Rate Reduction Defendants

53.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of interest rate reduction services, Interest Rate Reduction Defendants have represented, directly or indirectly, expressly or by implication, that:

a.      They are affiliated, or have established relationships, with consumers' lenders;

b.      They will negotiate lower interest rates for consumers within a few months;

c.      Consumers will save thousands of dollars as a result of Interest Rate Reduction Defendants' negotiations;

d.      Consumers will receive assistance from personal financial consultants; and

e.      Consumers will receive full refunds.

54.     In truth and in fact, Interest Rate Reduction Defendants are neither affiliated, nor have established relationships, with consumers' lenders.  Furthermore, in numerous instances, Interest Rate Reduction Defendants do not negotiate lower interest rates for consumers within a few months; consumers do not save thousands of dollars as a result of Interest Rate Reduction Defendants' negotiations, consumers do not receive

14

assistance from personal financial consultants, and dissatisfied consumers do not receive full refunds.

55.     Therefore, Interest Rate Reduction Defendants' practices, as set forth in Paragraphs 53 and 54, constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

56.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

57.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(v).

58.     The TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or

service.  The prerecorded message also must promptly disclose the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods or services.  16 C.F.R. § 310.4(b)(1)(v)(A) and (B).

59.     The 2010 amendments to the TSR were intended, in part, to curb deceptive and abusive practices in the telemarketing of debt relief services.  These amendments prohibit requesting or receiving payment of any fee or consideration for any debt relief service until and unless, among other things:

   a.     The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

   b.     The customer has made at least one payment pursuant to that settlement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector.

60.     The TSR also prohibits, while engaged in telemarketing, misrepresenting, directly or by implication, material aspects of any debt relief service, including, but not limited to, the amount of money that a customer may save by using such service, and the amount of time necessary to achieve the represented results, 16 C.F.R.§ 310.3(a)(2)(x).

61.     Interest Rate Reduction Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined in the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

Attachment A

62.     Interest Rate Reduction Defendants have "assisted and facilitated" sellers or telemarketers by providing substantial assistance or support while knowing or consciously avoiding knowing that the sellers or telemarketers are engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of the TSR.  16 C.F.R. § 310.3(b).

63.     Interest Rate Reduction Defendants are engaged in the marketing and sale of a "debt relief service," as that term is defined in the TSR, 16 C.F.R. § 310.2(m).

64.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE BY INTEREST RATE REDUCTION DEFENDANTS

### COUNT THREE

*Requesting and Receiving Prohibited Advance Payments*

65.     In numerous instances, in connection with the telemarketing of debt relief services, Interest Rate Reduction Defendants have requested and received payment of a fee or consideration for such service before:

a.     Renegotiating, settling, reducing, or otherwise altering the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

b.     The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector.

Attachment A

66.     Interest Rate Reduction Defendants' acts or practices, as described in Paragraph 65, violate Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT FOUR

### *Misrepresenting Debt Relief Services*

67.     In numerous instances, in connection with the telemarketing of debt relief services, Interest Rate Reduction Defendants have misrepresented, directly or by implication, material aspects of the debt relief service they sell, including that:

a.      They are affiliated, or have established relationships, with consumers' lenders;

b.      They will negotiate lower interest rates for consumers within a few months;

c.      Consumers will save thousands of dollars as a result of Interest Rate Reduction Defendants' negotiations;

d.      Consumers will receive assistance from a personal financial consultant; and

e.      Consumers will receive full refunds.

68.     Interest Rate Reduction Defendants' acts or practices, as described in Paragraph 67, violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R.§ 310.3(a)(2)(x).

## COUNT FIVE

69.     In numerous instances, in connection with the telemarketing of debt relief services, Fisher has provided substantial assistance or support to sellers or telemarketers

18

who he knew or consciously avoided knowing are engaged in acts or practices that violate §§ 310.3(a), (c) or (d), or § 310.4 of the TSR.

70.     Defendant's acts or practices as alleged in Paragraph 69 violate Section 310.3(b) of the TSR, 16 C.F.R. § 310.3(b).

## COUNT SIX

### *Initiating Unlawful Prerecorded Messages*

71.     In numerous instances, Interest Rate Reduction Defendants have initiated, or caused others to initiate, outbound telephone calls that deliver prerecorded messages to induce the purchase of goods or services.

72.     Interest Rate Reduction Defendants' acts or practices, as described in Paragraph 71, violate Section 310.4(b)(1)(v) of the TSR, 16 C.F.R.§§ 310.4(b)(1)(v).

## CONSUMER INJURY

73.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

74.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of the FTC Act.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution,

Attachment A

the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

75.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

B.     Enter a permanent injunction to prevent future violations of the FTC Act, and the TSR by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

Attachment A

D.    Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.


Dated:          August 30, 2012                    Respectfully submitted,

                                                   WILLARD K. TOM
                                                   General Counsel



                                                   _/s/ Melinda Claybaugh_____
                                                   MELINDA CLAYBAUGH
                                                   JULIA SOLOMON ENSOR
                                                   Federal Trade Commission
                                                   600 Pennsylvania Avenue, N.W., M-8102B
                                                   Washington, D.C. 20580
                                                   Tel:  (202) 326-2203 (Claybaugh)
                                                   Tel:  (202) 326-2377 (Ensor)
                                                   Fax: (202) 326-2558
                                                   Email:  mclaybaugh@ftc.gov;
                                                   jensor@ftc.gov

                                                   Attorneys for Plaintiff
                                                   FEDERAL TRADE COMMISSION

Attachment A